UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN SOLOMON,

    Plaintiff,

v.

BLAINE LAFLER et al.,

    Defendants.
_____/

Case No. 2:08-cv-13536

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u> (document no. 23)**

    The *pro se* plaintiff in this action is Martin T. Solomon, a prisoner in the custody of the Michigan Department of Corrections. Defendants are the Department and various personnel in the St. Louis Correctional Facility, where Solomon was confined in 2007, when the events in question took place. Solomon has also named the Facility itself as a defendant. As will be explained in more detail below, Solomon alleges that defendants, irritated by Solomon's filing of grievances against them, conspired to have him placed in segregation from the general prison population on phony misconduct charges. This, claims Solomon, violated his rights to free speech, to freedom from cruel and unusual punishment, to the equal protection of the laws, and to not be deprived of his liberty without due process of law. Accordingly, Solomon has brought suit under 42 U.S.C. sec. 1983 to recover for these alleged deprivations. The matter is before the Court on the defendants' motion for summary judgment.

**LEGAL STANDARD**

    Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more

than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

**FACTS**

As a preliminary matter, it is necessary to identify the defendants and their positions. The record evidence is uncontradicted on these matters. The Michigan Department of Corrections has custody of Solomon, and during 2007 held him at the St. Louis Correctional Facility ("the facility"). Blaine Lafler is the Warden of that facility. Steve Rivard is a Deputy Warden. Brenda Holland is a Hearing Investigator, whose job duties include gathering evidence on behalf of prisoners for prisoner misconduct hearings. Gerhardt Hansen is a Sergeant at the facility. Kathy Sheets was a Grievance Coordinator. Andrew Ellison is a Sergeant in the Segregation Unit at this facility, whose job duties include reviewing major misconduct reports who are confined in his Unit pending their hearings on the alleged misconduct. Ellison also explains the hearing procedures to these prisoners. Brian Patrick

3

is an Inspector at the facility. Wayne M. Groat is an Administrative Law Examiner of the State of Michigan, whose duties appear to include disciplinary hearings for prisoners accused of misconduct. Jim Armstrong is a Manager at the facility.

It is undisputed that, in early January of 2007, Solomon's cellmate was one Antonio Woods, and that Woods was unhappy sharing a cell with Solomon. It is also undisputed that at some time between January 3rd and January 5th, 2007, prison staff received a confidential tip that Solomon had bitten Woods on the hip. Solomon suggests, and the defendants do not dispute, that this tip came from Woods himself.

It is also undisputed that on January 5th, 2007, Hansen approached Solomon in the facility and began escorting him to the Segregation Unit. Although the defendants dispute it, Solomon asserts that during this walk, he asked Hansen why he was being segregated. According to Solomon, Hansen responded that he was being segregated as punishment for filing grievances against prison officials, and also because prison officials had proof that Solomon had committed a sexual assault on January 3rd, 2006. Solomon protested that he had not even been at the St. Louis Correction Facility on that date, but Hansen and the other guards present laughed, and Hansen stated, with profanity, that he did not care.

It appears that Solomon was placed on "administrative segregation" from the general prison population, pending a hearing on the misconduct charge. There is no dispute that on January 7th, Solomon wrote two grievances against prison staff. In one of the grievances, which the prison received on January 10th, Solomon complained that Woods had lied about the incident for which Solomon had been segregated in hopes of being assigned a new cellmate, and had executed an affidavit admitting as much. *See* Mich. Dep't of Corr. Prisoner/Parolee Grievance Form # SLF-07-01-0057-27B, document no. 23-10 at 10. In the other grievance, which prison staff did not receive until January 23rd,

4

Solomon stated that numerous items of his personal property had been stolen from his cell while he was in segregation, and demanded compensation for this property.  Mich. Dep't of Corr. Prisoner/Parolee Grievance Form # SLF 07-01-0107-19d, document no. 23-10 at 18.  There is no explanation in the record as to how Solomon, who apparently was still in segregation, could learned of the missing property or of Woods's affidavit.  Solomon does appear to state that Woods somehow forwarded the affidavit to him on January 9th.

Only one document purporting to be an affidavit from Woods appears in the record.  *See* document no. 25, pp. 17-18.  This "affidavit" is not signed, and it bears two different dates: in the second line of the document appears the heading "Date: 1/6/07."  At the end of the document, where one would have expected the affiant's signature, is written "1/17/07."  As January 17th was Solomon's hearing date, it is not clear whether this notation is intended to denote the date of the affidavit, or whether it was added when the document was adduced in evidence at the hearing.  In the document, Woods states that his allegations against Solomon were false, that he was irrational at the time he made them, and that defendants Patrick and Rivard "force[d]" him to level the charges in some unspecified way.

Also on January 9th, 2007, Hansen filled out a Major Misconduct Report, detailing the above accusations against Solomon.  *See* Mich. Dep't of Corr. Major Misconduct Report # 7-206, document no. 23-6 at 2.  On the report Hansen indicated that the date of the incident was January 3rd, 2006.  In his affidavit, Hansen states that he misstated the year as 2006 instead of 2007 – the sort of misstatement that of course is a common mistake in the early days of a new year.  The nature of the charge was now listed as "Assault and Battery (Prisoner Victim)."

That same day, Ellison reviewed the charge with Solomon. Solomon states that he showed Ellison the affidavits from Woods, and that Ellison's response was that he did not care what Woods said, and that "guilty or not guilty, you are gonna be in segregation for a while." Solomon does not specify whether this was a reference to a punitive segregation, or merely to Solomon's segregation pending the hearing. Solomon also states that at one point or another during the process, he showed Woods's affidavits to each of the defendants, but that none of them offered a favorable response.

There is no dispute that defendant Sheets responded to Solomon's grievance, and that Holland assisted in the information-gathering process in anticipation of the hearing on the misconduct charge. On January 10th, either Sheets or Holland gave Solomon a form which permitted him to submit questions relevant to the hearing to his fellow prisoners. Solomon notes that the form stated that the charge now listed on the form was "fighting." Holland states that this was a clerical error; apparently the same electronic template is used for these forms in every proceeding, and prison staff must fill in the specific charge for each prisoner before printing them out, but forgot to do so for Solomon, with the result that the charge against the previous prisoner showed up on his form.

On this form, Solomon requested that Holland ask Woods whether he had in fact executed an affidavit admitting to such a falsehood, and whether he had stated the initial falsehood in order to be removed from Solomon's cell. *See* Mich. Dep't of Corr. Hearing Investigation Report, document no. 23-8 at 4. Solomon states, without contradiction from the defendants, that Holland did not ask Woods these questions. When Solomon complained about this to defendant Holland, he alleges that her response was to advise him not to file a grievance. According to Solomon, Holland warned him "see what we are

6

doing to you now"– apparently a reference to his being in segregation, and a threat that worse would ensure if he grieved the matter.

Solomon's hearing took place on January 17, 2007, before defendant Groat. The hearing report, document no. 23-9, indicates that Groat received into evidence "two purported affidavits from prisoner Woods indicating that there was no sexual misconduct." The report also indicates, however, that Groat found the confidential informant's report to be credible, and that Solomon was guilty of the charges against him. Other than his characterization of the affidavits as "purported," Groat made no written findings as to their authenticity or credibility. Groat did not require a personal interview of Woods, or even acknowledge that Solomon had requested one. Solomon claims that at the hearing, Groat stated to him that Groat had spoken with Lafler and other prison officials about Solomon's grievances, and that Solomon must be found guilty regardless of whether he had been in the facility in early 2006.

It is undisputed that Groat ordered that Solomon be placed in "detention" for 30 days, and that after this period Solomon was kept in segregation for some additional period of time, on the stated ground that he was dangerous to other prisoners. According to the prison records adduced in evidence, this segregation lasted at least until February 28th, 2007.

Solomon further claims that he continued to file grievances and other complaints, until defendant Lafler finally met with him. The record does indicate that Solomon composed additional grievances on January 18 and January 23, which were received by the facility staff on January 24 and February 6, respectively. Mich. Dep't of Corr. Prisoner/Parolee Grievance Forms #s SLF 07-01-0114-28A and SLF 07-02-0203-11G; document no. 23-10 at 26, 4. Solomon states that at their meeting Lafler told him, in an apparent reference to

7

Solomon's segregation, that "[g]uess next time you think twice before filing a grievance." At a later similar meeting, Solomon says that Lafler threatened him with a transfer to a different facility, and warned him that he had "made some powerful enemies within the MDOC." Finally, Solomon claims that at some unspecified time, defendant Patrick threatened him with additional time in segregation if Solomon continued to file grievances.

As a result of his disciplinary detention and administrative segregation, Solomon claims to have been isolated from the general prison population for over 90 days total.

## ANALYSIS

I.   Sec. 1983 Claims

42 U.S.C. § 1983 permits a person who has been subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by an action taken under color of state law to bring suit against the government official who worked the deprivation. Obviously then, a key question in every § 1983 case is whether the Constitution or another federal law has been violated. The courts, however, have also interpreted § 1983 to include a "qualified immunity" for government officials who violate constitutional rights that, at the time of violation, were not so "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Lanman v. Hinson*, 529 F.3d 673, 688 (6th Cir. 2008).

There is no longer a legal requirement that a court determine whether the defendants' actions violated a constitutional right before considering whether the right was "clearly established." *Pearson v. Callahan*, 555 U.S. ---, 129 S. Ct. 808, 818-22 (2009). In this case as in many others, the Court will conclude that even on Solomon's own evidence, the actions taken by the defendants clearly did *not* violate any constitutional rights.

8

Accordingly, in the following analysis the two stages of the qualified-immunity analysis are conflated for purposes of simplicity.

II. Immunity

The Court will first consider Solomon's claims as against defendant Groat. Solomon argues that Groat wronged him by conspiring with the other defendants to convict Solomon of false charges, and then actually doing so, using Groat's power as an MDOC hearing officer. Unfortunately for Solomon, the official actions of MDOC hearing officers, however, are protected by absolute judicial immunity. *Shelly v. Johnson*, 849 F.2d 228, 229-30 (6th Cir. 1988), *cited in Barber v. Overton*, 496 F. 3d 449, 452 (6th Cir. 2007). This immunity applies even when the plaintiff asserts that the officer's harmful official actions were the implementation of a conspiracy, which may have been entered into outside the course of the officer's official duties. *See Kurz v. Michigan*, 548 F. 2d 172, 174 (6th Cir. 1977). Accordingly, summary judgment is warranted in favor of Groat on all of Solomon's claims.

Insofar as Solomon seeks to recover against the Michigan Department of Corrections and the St. Louis Correctional Facility, his claims are also barred by the Eleventh Amendment to the United States Constitution. Under the Eleventh Amendment, "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment," whether or not the state is formally named as a defendant. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). This rule plainly defeats Solomon's claims against the state-funded Michigan Department of Corrections and St. Louis Correction Facility, insofar as they seek monetary relief. Because the Supreme Court has held "that a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents," *Brandon v. Holt*, 469 U.S. 464, 471

9

(1985), Solomon's damages claims against the other defendants in their official capacities must fail as well.

Although Congress can abrogate the states' sovereign immunity, it has not done so in § 1983. *Edelman*, 415 U.S. at 675-76; *Berndt v. Tennessee*, 796 F. 2d 879, 881 (6th Cir. 1986).. Likewise, although Michigan has the ability to waive its immunity, it has not done so with respect to suits like this one. *E.g., Ruiz v. Hofbauer*, No. 08-1257, 2009 WL 1421108, at *2 (6th Cir. May 20, 2009). Accordingly, insofar as Solomon seeks money damages, summary judgment is warranted for the Department of Corrections and the St. Louis Correctional Facility on all his claims, and for all defendants on the claims brought against them in their official capacities.

### III. First Amendment Retaliation Claim

Solomon asserts that the defendants' actions amounted to retaliation against him for exercising his First Amendment rights, by filing grievances. To make out a claim of First Amendment retaliation, a plaintiff must show

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Thaddeus-X v. Blatter*, 175 F. 3d 378, 397 (6th Cir. 1999) (en banc) (quoting *Bloch v. Ribar*, 156 F. 3d 673, 678 (6th Cir. 1998). Defendants do not contest that Solomon's grievances qualifies as constitutionally protected activity. They do argue, however, that he has failed to establish a causal connection between the grievances and his segregation.

As an initial matter, the Court notes that the Solomon has not alleged that he engaged in any protected activity other than filing grievances. Further, as far as the record discloses, the MDOC received Solomon's first-ever grievance on January 10th, 2007. This

10

was a full week *after* the alleged assault occurred, four days after Hansen escorted Solomon to segregation and informed him that it was in retaliation for filing grievances, and one day after Hansen filled out the Major Misconduct Report indicating that Solomon had bitten Woods. Thus, to the extent that Solomon's charges against Hansen, Patrick and Rivard are based on events that allegedly occurred before January 7th, Solomon has patently failed to even allege a causal connection between any their actions and any protected activity of his. Although Solomon alleges that Patrick and Rivard had some later involvement in his case, Hansen's complained-of actions apparently ended on January 9th, when he signed the report. Accordingly, this ground alone would suffice for summary judgment as to him.

Even with respect to the other defendants, this discrepancy in the timeline means that Solomon's claim is sharply diminished in stature. Solomon has failed to establish any causal connection between his grievances and any action taken by the defendants prior to at least January 10th. Accordingly, he cannot plausibly claim that defendants manufactured the initial complaint against him out of retaliatory animus. Furthermore, the defendants argue that in light of this initial *bona fide* complaint, they would undoubtedly have retained Solomon in segregation for some time even if he had never filed a grievance. A defendant may defeat a finding of a causal connection between his adverse action and a plaintiff's protected speech activity by showing "that it would have reached the same decision [about the adverse action] even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ'n v. Doyle*, 429 U.S. 274, 287 (1977). The Court agrees that, with respect to Solomon's pre-hearing segregation, there is no issue of fact but that the defendants would have pursued precisely the same course of action even had Solomon

11

never filed a grievance. Accordingly, they are entitled to summary judgment with respect to this aspect of his case.

Solomon's claim, then, must be that at some point on or after January 10, the defendants decided to prosecute the charges already brought against him in an unfair and vindictive manner due to the grievances he filed, and that as a result he was sentenced to a disciplinary detention that he would not otherwise have suffered. More specifically, Solomon would have to show that defendants' failure to interview Woods, despite Solomon's request, was retaliatory in nature, and that if they had complied with this request Solomon would not have been convicted of the assault charge.

Even this claim, however, cannot wholly survive a motion for summary judgment. It is the law of this Circuit that a defendant can be liable for a retaliatory adverse action only if the defendant himself had the authority to take that action. In *Shehee v. Luttrell*, 199 F. 3d 295 (6th Cir. 1999), the plaintiff was a prisoner who had a position working in the prison commissary. The plaintiff alleged that, in exchange for permitting him to work in this plum job, one of the defendants, a prison employee, demanded kickbacks in the form of free goods from the commissary. *Id.* at 297. Shehee claimed that when he refused to participate in the kickback scheme, two of the defendants fabricated charges that he was attempting to produce alcohol in the commissary. *Id.* at 297-98. When Shehee filed grievances over this, he was fired from his post in the commissary. *Id.* at 298. Like Solomon in this case, Shehee filed suit alleging, among other things, that the defendants had retaliated against him for his exercise of his First-Amendment grievance rights. The Sixth Circuit, however, upheld a grant of summary judgment for the defendants on this claim, holding that "[d]espite Shehee's contention that Fleming and Morgan instigated his firing, these men did not have the ability to terminate Shehee from his commissary position.

For this reason, Shehee simply does not set forth a valid First Amendment retaliation claim against Fleming or Morgan." *Id.* at 301. *See also Poppy v. City of Willoughby Hills*, 96 F. App'x 292, 294-95 (6th Cir. 2004) (mayor of town could not be liable for retaliating against plaintiff by , among other things, "lobbying the City Council to fire" her, because only the Council had the power to effect the termination);

The defendants correctly point out that none of them individually had the power to impose disciplinary detention on Solomon – only Groat or another hearing officer could do that. Furthermore, it appears that under Michigan Department of Corrections policies, the decision to classify Solomon in administrative segregation following his disciplinary detention had to be made by the facility's Security Classification Committee, who are not named as defendants. *See* Michigan Department of Corrections Policy Directive no. 04.05.120, document no. 23-4, pp. 4-5. With respect to Solomon's disciplinary detention, therefore, the Court finds this case to be indistinguishable from *Shehee*. Solomon has alleged, and adduced some evidence, that several of the defendants retaliated against him for filing grievances. He claims that they did so by acting together to suppress his defense to a major misconduct charge. But because the defendants themselves did not have the authority to convict Solomon of this charge, under *Shehee* they cannot be liable for trying to frame him on it.

If Solomon's accusations are true, this is undoubtedly a very difficult situation for him. Under the law, the officers who allegedly set him up for wrongful discipline are immune because they did *not* have the power to convict him. But on the other hand, the officer who handed down the sentence is immune because he *did* have such power. Even if Solomon was in fact seriously wronged, then, he is left with no one against whom he can recover. This Court, however, is not free to disregard *Shehee* and its progeny. It may be that the

13

courts deciding those cases did not contemplate a situation like this one, where the ultimate decisionmaker enjoys absolute immunity. Nothing in those cases' rationales, however, would prevent them from applying in this situation. Accordingly, the Court will grant summary judgment with respect to all defendants on Solomon's First Amendment retaliation claim.

IV. Due Process Claim

The Fourteenth Amendment to the United States Constitution provides that no State shall " deprive any person of life, liberty, or property, without due process of law." Solomon argues that, because defendants prevented him from presenting Woods's testimony at his hearing and ignored Woods's affidavits proclaiming Solomon's innocence, Solomon was deprived of his liberty without due process.

The United States Supreme Court has held, however, that segregating a prison inmate from the general population does not deprive the inmate of any constitutional "liberty" interest unless it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 483-84 (1995). In *Sandin*, the Court held that even punitive segregated confinement did not violate a prisoner's liberty interests, because it did not present an "atypical, significant deprivation." *Id.* at 486. In *Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005), the Court suggested that 23-hour-per day solitary confinement, with 24-hour lighting, no conversation between cells, and a 1-hour exercise period in a "small indoor room," would not implicate a prisoner's protected liberty interests in the absence of some "added components." *Id.* The *Wilkinson* Court did find the prison conditions in question to amount to a deprivation of liberty, but only because (1) they were imposed on prisoner for indefinite periods of time, with only a yearly review, and (2) their imposition also suspended the prisoner's parole eligibility. *Id.* at 284.

14

Here, the record contains little evidence of the conditions of Solomon's punitive detention. Michigan prison regulations require in detail that such detainees be treated in a humane fashion, *see* Michigan Department of Corrections Policy Directive # 04.05.120, document no. 23-4, pp. 4-6, and Solomon makes no substantial representations that he was not. In addition, his disciplinary sentence was for a determinate period of 30 days, and there is no indication that it affected any parole eligibility he may have had. Accordingly, the Court finds that there is no genuine issue of fact but that Solomon has not been deprived of any constitutional liberty interest. Summary judgment in favor of the defendants on this claim is therefore appropriate.

V.   Equal Protection and 8th Amendment Claims

Solomon alleges, in conclusory fashion, that defendants violated his Eighth Amendment right to be free of cruel and unusual punishment. The Eighth Amendment requires that prison "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). If prison conditions do not go this far, even though may be "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* Here, there is no evidence that Solomon's punishments even approached a cruel and unusual standard, and summary judgment will therefore be entered on this claim in favor of all defendants.

Solomon also alleges that he has been deprived of equal protection of the laws, in violation of the 14th Amendment to the United States Constitution. The Equal Protection Clause " is essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), but unless a plaintiff can show that the statute or action he challenges discriminates based on race or

15

some other protected characteristic, the states are given broad latitude to determine which distinctions are worth drawing and which are not, *id.* at 339-40. Here, Solomon has adduced no evidence of his membership in any protected class. Further, has he made no demonstration that the defendants' refusal to credit the purported affidavits from Woods was based on anything other than their assessment of the merits of the situation, or that they would have come to a different conclusion had a different inmate been involved. Accordingly, there is no genuine issue of fact remaining as to Solomon's equal protection claim, and summary judgment will be entered for the defendants.

## VI. Conspiracy Claim

Finally, Solomon asserts that all the defendants conspired to deprive him of his constitutional rights. As described above, Solomon has adduced no evidence that any such violation occurred. Furthermore, the only colorable evidence of a conspiracy that Solomon has adduced is Woods's affidavit that defendants Patrick and Rivard "forced" him to falsely accuse Solomon of biting him. This assertion appears in the record only as an unsigned affidavit, and therefore the Court would not consider it even if its contents would in fact establish Solomon's claim.

## CONCLUSION AND ORDER

Insofar as Solomon seeks money damages, the Michigan Department of Corrections, the St. Louis Correctional Facility, and all the defendants as sued in their official capacities are entitled to summary judgment on the basis of their Eleventh Amendment immunity. Defendant Groat is entitled to summary judgment on all claims due to his judicial immunity.

All defendants sued in their personal capacities are entitled to summary judgment on Solomon's First-Amendment retaliation claim. Hansen, and also Patrick and Rivard in part, are entitled to summary judgment because there is no issue of fact but that their alleged

adverse actions against Solomon took place before he engaged in any protected activity, and thus could not have been causally connected. Lafler, Holland, Hanson, Sheets, Ellison, Armstrong, as well as Patrick and Rivard to the extent they were involved in disciplining Solomon after he filed his first grievance, are entitled to summary judgment because (1) there is no question of fact but that Solomon would have been placed on pre-hearing administrative segregation even had he never filed a grievance, and (2) none of these defendants had the authority to sentence him to the detention or segregation that he served after the hearing.

All defendants sued in their personal capacities are also entitled to summary judgment on Solomon's due process claim, because Solomon has failed to generate a question of fact as to whether the detention and segregation deprived him of a protected liberty interest. They are entitled to summary judgment on his equal protection and 8th Amendment claims, because there is no evidence that Solomon was treated in an unlawfully discriminatory or inhumane fashion. As there is thus no evidence of any constitutional violation, defendants are also entitled to summary judgment on Solomon's conspiracy claim.

**WHEREFORE**, it is hereby **ORDERED** that defendants' motion for summary judgment is **GRANTED**. Judgment will be entered, and the case will be closed.

**SO ORDERED.**

                                                s/Stephen J. Murphy, III
                                                STEPHEN J. MURPHY, III
                                                United States District Judge

Dated: August 24, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 24, 2009, by electronic and/or ordinary mail.

                                          Alissa Greer
                                          Case Manager